JUSTICE McKINNON,
specially concurring.
*271 ¶29 I agree with the Court’s conclusion that “a downstream appropriator has no rights to water stored behind an upstream dam as long as the dam operator releases the natural inflow into the stream below the dam.” Opinion, ¶ 21.1 write separately, however, to address what I believe was ultimately decided in the Schuh Decree and to recognize what remains unresolved between the parties. The provisions of the Schuh Decree must be read together, along with the findings regarding natural flow.
¶30 The Schuh Decree recognized that the Company was the owner of, and entitled to, a total of 1200 miner’s inches of Flint Creek by virtue of certain appropriations made in 1888,1889, and 1891. Schuh Decree, ¶ 2. The purpose and beneficial use of these appropriations was to generate electricity. Schuh Decree, ¶ 2. In 1901, as owner of these appropriations, the Company’s predecessor completed construction of a dam, begun in 1891, for the purpose of storing water diverted pursuant to its appropriations. Schuh Decree, ¶ 2. In 1902, the Company filed a complaint in federal district court requesting a determination of the “amounts of water which your orator shall be compelled to allow to flow from the said storage reservoir during the irrigation season ....”
¶31 The Schuh Decree must be evaluated within the context of the Company’s request to establish a quantity or amount of instream flow. The Schuh court found specifically that “the amount of water reasonably and necessarily required to run and operate said electric plant of the complainant to its full capacity, and which has been and now is so used by the complainant, is about 30 second feet, or 1200 miner’s inches of water.” Schuh Decree, ¶ 5. Significantly, the Schuh Decree further found that through its electric power plant, the Company has permitted to flow down through the natural channel 1200 miner’s inches of water, in such a manner that none of the downstream users have been damaged. Schuh Decree, ¶¶ 7, 14. More specifically, the Schuh court determined that the Company
had not—during the irrigating seasons since the construction of its dam, detained or deprived the defendants of, the ordinary and natural flow or passage of the water of said Flint Creek, that is in quantities as the same would naturally run at such times, otherwise than is necessary to the reasonable and proper operation of its electric plant and machinery.
Schuh Decree, ¶ 9. The Schuh court determined the natural flow rate of Flint Creek above the dam to be 1200 miner’s inches, which the Company was entitled to divert as long as it was returned to Flint *272 Creek, in the amount of 1200 miner’s inches, for the lands of downstream users. Schuh Decree, ¶ 4.
¶32 Importantly, the Schuh court continued to recognize entitlement by downstream water users to appropriate amounts greater than 1200 miner’s inches, many of which had senior appropriation dates to the Company. Schuh Decree, ¶ 15. As observed by the Water Court, those combined rights far exceeded 1200 miner’s inches. Therefore, the Schuh Decree determined only the amount of instream flow the Company was entitled to divert and, thereafter return, to Flint Creek. The Schuh court’s conclusion that downstream users are “enjoined and restrained” from “obstructing or interfering with the use and enjoyment of said dam and reservoir and the storing of water therein,” and that the natural flow was 1200 miner’s inches, refers to the amount of water the court previously established as the natural flow of Flint Creek, which the Company demonstrated it could use and return to Flint Creek without harm to downstream appropriators. Schuh Decree, ¶ 20. Downstream appropriators were restrained from demanding “any greater amount of water than the average natural flow” be returned for downstream appropriators. Schuh Decree, ¶ 20. Therefore, I agree, based on the entirety of the Schuh Decree, that the Company is not required to release storage water in favor of downstream users to supplement natural flows of Flint Creek which are below 1200 miner’s inches. The Schuh Decree clarified instream flow which, if available, could be diverted by the Company, and returned for the lands of downstream users.
¶33 While the Schuh Decree made a specific finding that quantifies Flint Creek’s average natural flow above the dam, it did not enjoin downstream users with senior rights from appropriating amounts in excess of 1200 miner’s inches when the flow exceeded 1200 miner’s inches in Flint Creek. These downstream rights, together with those of the Company, remain subject to the doctrine of prior appropriation. The Water Court correctly recognized that the law requires operators of reservoirs to make the natural flow of a stream available to senior downstream appropriators during times of shortage. Thus, natural flow can be stored only when there is enough water to satisfy senior rights, or when senior rights are not being used.
¶34 Therefore, I would clarify and definitively reject McDonald’s argument that the Schuh Decree enjoins downstream users from appropriating no more than 1200 miner’s inches during the irrigation season. In my opinion, the Schuh Decree established a quantity of natural flow above the dam only, and it did not enjoin downstream *273 users with senior rights from appropriating amounts in excess of 1200 miner’s inches when the flow exceeded 1200 miner’s inches in Flint Creek. It similarly did not compel the Company to draw from its reservoir to supplement instream flow when those rates were below 1200 miner’s inches—the amount the Schuh Decree quantified as a finding of fact as the average instream flow.